UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERESA LYDA STREMPLE,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | No. 1:20-cv-01139-GSA<br><br>**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF AND AGAINST DEFENDANT**<br><br>**(Doc. 23)** |

### I. Introduction

Plaintiff Teresa Lyda Stremple appeals the decision of the Commissioner of Social Security denying her application for disability insurance benefits (DIB) under Title II of the Social Security Act.[1] Because substantial evidence and applicable law do not support the ALJ's decision, the appeal will be granted.

### II. Factual and Procedural Background

On May 26, 2016, Plaintiff applied for DIB alleging disability beginning August 7, 2015, due to peripheral neuropathy, ventricular bigeminy, arrythmia, mitral valve prolapse, insomnia, major depressive disorder, and anxiety disorder. The applications were denied initially and on reconsideration. AR 106, 112. The ALJ held a hearing on July 17, 2019. AR 34–74. On September 12, 2019, the ALJ issued an unfavorable decision. AR 12–33. The Appeals Council denied review on June 9, 2020, and this appeal followed.

### III. The Disability Standard

Under 42 U.S.C. §405(g), this court has the authority to review the Commissioner's denial of disability benefits. Reversal is appropriate when the ALJ's findings are based on legal error or unsupported by substantial evidence." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999). Substantial evidence is that which could lead reasonable minds to accept a conclusion. *See*

---

[1] The parties consented to the jurisdiction of a United States Magistrate Judge. Docs. 11, 12.

1

*Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla but less than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996).

The court must consider the record as a whole, not isolate a specific portion thereof.  *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).  If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

A disability claim is evaluated using five-step analysis.  20 C.F.R. §§ 416.920(a)-(f).  The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled.  20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level.  20 C.F.R. § 416.920(a)-(f).  While the Plaintiff bears the burden of proof at steps one through four, the burden shifts to the commissioner at step five to

prove that Plaintiff can perform other work in the national economy given her RFC, age, education and work experience. *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).

### IV.  The ALJ's Decision

At step one the ALJ found that Plaintiff had not engaged in substantial gainful activity between her alleged onset date of August 7, 2015 through her date last insured of December 31, 2016.  AR 17.  At step two the ALJ found that Plaintiff had the severe impairment of multifocal motor neuropathy and the following non-severe impairments: mitral valve prolapse, obesity, vitamin D deficiency, hyperlipidemia, depressive disorder and anxiety disorder.  AR 18–20.

At step three the ALJ found that Plaintiff did not have an impairment or combination thereof that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 20.

Prior to step four the ALJ evaluated Plaintiff's residual functional capacity (RFC) and concluded that Plaintiff had the RFC to perform medium work as defined in 20 C.F.R. 404.1567(c) subject to the following:

> she can lift and carry up to 25 pounds occasionally and up to 10 pounds frequently. She can occasionally climb on ropes, ladders, and scaffolds. She can frequently climb on ramps and stairs, and can frequently stoop, kneel, crouch, or crawl. She can perform work allowing her to avoid concentrated exposure to work hazards such as unprotected heights and being around dangerous moving machinery.

AR 20–27.

At step four the ALJ concluded that, through Plaintiff's date last insured, Plaintiff could perform her past relevant work as a Human Resources Generalist or Personnel Manager as generally performed.  AR 27-28.  Accordingly, the ALJ concluded that Plaintiff was not disabled at any time between the alleged disability onset date of August 7, 2015 and the date last insured of December 31, 2016.  AR 28.

### V.  Issues Presented

Plaintiff asserts three claims of error: 1- that the ALJ improperly rejected the opinion of her treating neurologist, Dr. Bhatia; 2- that the ALJ erred in finding her mental impairments non-severe and in rejecting the consultative examining opinions of Drs. Portnoff and Michiel to the contrary;

and, 3- that the ALJ improperly rejected Plaintiff's testimony.

### A.     Dr. Bhatia; Physical RFC

#### 1.     Applicable Law

Before proceeding to step four, the ALJ must first determine the claimant's residual functional capacity. *Nowden v. Berryhill*, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018). The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC must consider all of the claimant's impairments, including those that are not severe. 20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins,* 466 F.3d at 883. *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

For applications filed before March 27, 2017, the regulations provide that more weight is generally given to the opinion of treating physicians, which are given controlling weight when well supported by clinical evidence and not inconsistent with other substantial evidence. 20 C.F.R. § 404.1527(c)(2); *see also Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), as amended (Apr. 9, 1996) (noting that the opinions of treating physicians, examining physicians, and non-examining physicians are entitled to varying weight in residual functional capacity determinations).

An ALJ may reject an uncontradicted opinion of a treating or examining physician only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a contradicted opinion of a

treating or examining physician may be rejected for "specific and legitimate" reasons. *Id.* at 830. In either case, the opinions of a treating or examining physician are "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). Regardless of source, all medical opinions that are not given controlling weight are evaluated using the following factors: examining relationship, treatment relationship, supportability, consistency, and specialization. 20 C.F.R. § 404.1527(c). The opinion of a non-examining physician (such as a state agency physician) may constitute substantial evidence when it is "consistent with independent clinical findings or other evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002

### 2. **Analysis**

Dr. Bhatia wrote a letter to the state Department of Social services which contained functional components that the ALJ described and critiqued as follows:

> The undersigned considered the January 9, 2019, statement from Perminder Bhatia, M.D., who confirmed a treating relationship with the claimant for several years as well as an examination on January 9, 2019 (Ex. 8F). Dr. Bhatia specifically recommended the claimant cannot stand more than 10 minutes, cannot sit more than 10 minutes, has to change positions, and cannot hold things because her hands are numb (Ex. 8F/3). He then also stated, she cannot lift, cannot bend, cannot walk in a straight line, has a risk of fall if she lifts anything heavy, and cannot lift anything more than a gallon of milk (Ex. 8F/3). As explanation, he documented her history of present illness including, "She has been complaining of significant pain 8 to 9/10 with tingling, numbness, and burning in the hands and feet. She has been tried on multiple high level pain medication opioid without any much relief. I have even offered her spinal cord stimulator. She complains of significant pain in the hands and feet, numbness in the hands and feet, dropping things from the hands, not able to walk and not able to stand and also balance impairment" (Ex. 8F/1).
> In contrast, despite decreased pinprick in the hands up to the elbow, and in the feet up to the knees with decreased vibratory sense in the feet, his exam showed she has normal heart rate and sounds, clear lungs, normal abdomen, normal neurologic exam, and even nearly normal motor exam despite absent reflexes (Ex. 8F/2). Further, her finger-to-nose and knee-to-heel tests are normal (Ex. 8F/2). Although she had a positive Romberg, and walked slowly holding something while walking with closed eyes, her musculoskeletal movements were normal (Ex. 8F/2). In fact, he even noted, "So far, the workup has been negative" (Ex. 8F/1, 3). His opinion about her functional limitations is simply not supported by or consistent with his own exam findings. His opinion is also not consistent with his treatment notes

documented in Exhibits 4F and 10F . . .

AR 26 (emphasis added).

Thus, the ALJ rejected the opinion primarily for three reasons, including: 1- contrasting and/or unsupportive findings documented in the January 2019 examination notes that accompanied the opinion; 2- that Dr. Bhatia even described the workup to date as "negative," and 3- that it was inconsistent with the treatment notes documented in exhibits 4F and 10F.

### a. **Contrasting/Unsupportive Examination Findings**

As the ALJ conceded not all of the findings contrasted with Dr. Bhatia's opinion. Rather, Plaintiff had: 1- decreased pinprick in the hands up to the elbow; 2- decreased pinprick in the feet up to the knee; and, 3- decreased vibratory sense in the feet.

Normal heartrate/sounds, clear lungs, and normal abdomen did not contrast with Dr. Bhatia's opinion as those bodily systems are unrelated to neuropathy. The fourth purportedly contrasting finding was "normal neurological exam" which does not appear in the examination notes (AR 831-832) but seems to be the ALJ's interpretation of the exam.

The next purportedly contrasting finding was "even nearly normal motor exam despite absent reflexes," which has yet another disclaimer, namely absent reflexes. The ALJ then noted normal finger-to-nose test, normal knee-to-heel test, and normal muscle movement despite imbalance while walking with eyes closed, positive Romberg (vestibular function and proprioception), and finally (though not identified by the ALJ), inability to tandem walk.

At a certain point the disclaimers and exceptions swallow the ALJ's original point, namely that the physical examination findings accompanying Dr. Bhatia's opinion contrasted with the opinion. This however is not a supportable conclusion, particularly as to standing and walking (which Dr. Bhatia opined was limited to 10 minutes, whereas medium work requires 6 of 8 hours). In the cited examination, the findings as to gait were uniformly abnormal: "She walks slow. She

cannot do tandem gait, and she has to hold something while walking with closed eyes. Romberg is positive." Normal muscle tone, strength, and movement would be relevant as well, but not necessarily more functionally relevant than the abnormalities as to gait, sensation, and reflexes.

### b.     "Negative Workup"

The ALJ then emphasized that "In fact, [Dr. Bhatia] even noted, 'So far, the workup has been negative.' " AR 26 (citing AR 430, 432). Yet a May 6, 2015 EMG showed low amplitude in bilateral peroneal nerves with Poluphasic MUPs in bilateral tibialis anterior and EDB (extensor digitorum brevis) muscles--findings Dr. Bhatia interpreted as "electrical evidence of multifocal motor neuropathy." AR 391.[2] Indeed, the ALJ did not conclude otherwise. Thus, the emphasis on Dr. Bhatia's use of the phrase "negative workup" did not add to the ALJ's analysis.

### c.     **Inconsistency with Exhibits 4F and 10F**

The ALJ also found Dr. Bhatia's opinion inconsistent with the clinical examination evidence included at Exhibits 4F and 10F. Earlier in the decision the ALJ summarized those exhibits as follows:

> The claimant had good days and bad days but was doing okay when Dr. Bhatia saw her on September 4, 2015 (Ex. 4F/6). He confirmed conservative treatment involving OxyContin at 40 milligrams b.i.d. (for twice a day) with Oxycodone at 30 milligrams four times a day (Ex. 4F/6). However, he noted no surgery or other aggressive interventions. He noted a follow up appointment in October 2015. On November 17, 2015, she described pain on average of "8" and at worst as "9" and asserted worse functioning, but she acknowledged if she stayed on it, her current pain relievers were enough (Ex. 4F/28). She reported no side effects other than constipation (Ex. 4F/29). Dr. Bhatia noted the EMG testing, her complaints of progression with weakness in the dorsiflexors of the foot, particularly the peroneal nerves, and he confirmed decreased reflexes (Ex. 4F/7). He gave her a trial with 1 dose of IVIG (intravenous immunoglobin) for five treatments (Ex. 4F/7). However, in February 2016, Dr. Bhatia noted the IVIG did not provide relief so he did not repeat this treatment and he had changed her pain medication to Levorphanol with Oxycodone and Cymbalta (Ex. 4F/8). He noted no problems other than her complaints of "some jerkiness" (Ex. 4F/8). In fact, he confirmed full motor power (5/5) in the upper and lower extremities with normal muscle tone, no atrophy, and

---

[2] Elsewhere Dr. Bhatia explained that Plaintiff suffered peripheral neuropathy "the etiology of which is not clear" (AR 379), which is perhaps what he meant by "negative workup."

no fasciculations (Ex. 4F/8). Additionally, her nerves were normal (Ex. 4F/8). Despite decreased pinprick and vibratory sense in the feet, her gait was normal and her finger-to-nose and knee-to-heel tests were normal (Ex. 4F/9). He noted no new laboratory studies (Ex. 4F/9). Further, he explained the etiology of her neuropathy was "not clear" (Ex. 4F/9). Noting her confirmation of good response and improvement with staying on her medication schedule, he kept her on her medications with an increase of Levorphanol to 6 tablets a day slowly (Ex. 4F/9, 30). He noted her urine drug screening but ordered no new lab tests (Ex. 4F/9). He simply continued her medications with a prescription for Oxycodone 30 milligrams twice a day as needed for breakthrough pain (Ex. 4F/9). In February 2016, Dr. Bhatia noted the claimant was to return to see him in 3 months (Ex. 4F/9). However, on May 9, 2016, when she saw a new health care provider, she told him her Levorphanol prescription had expired (Ex. 3F/3). When the claimant returned to his office on May 10, 2016, Dr. Bhatia noted no new weakness or numbness and she admitted her medicines were helping (Ex. 4F/10). He made no treatment changes. He noted she was negative for all other systems other than her chief complaint (Ex. 4F/10). He observed mental functions were normal, cranial nerves were normal, motor exam was normal, and reflexes were normal. Unlike the exam during the earlier appointment, the claimant's sensory exam was normal to pinprick, touch, and vibration (Ex. 4F/10). Similarly, double sensory stimulation was normal, gait was normal, finger-to-nose and knee-to-heel testing was normal (Ex. 4F/10). Notably, the claimant admitted her pain medication provided relief and her functioning had improved in almost all areas (Ex. 4F/32). She denied side effects (Ex. 4F/33). He ordered no lab tests (Ex. 4F/10-11). In August 2016, the claimant described herself as 50% better (Ex. 4F/35). On November 1, 2016, she was complaining of pain at "7" to "8" on a 10-point scale with good and bad days and constipation from the Oxycodone (Exs. 4F/12; 10F/58). Although Dr. Bhatia found decreased sensation to pinprick, her reflexes, gait, muscle tone, and power were normal and her finger-to-nose and knee-to-heel tests were normal (Exs. 4F/12-13; 10F). He made no changes to her medications (Exs. 4F/12-13; 10F/58-59).

Notably, the consultative exams and treatment notes from after the relevant period do not support adoption of greater limitations for the relevant period (Exs. 6F-12F). In February 2017, the claimant complained of problems getting her medication due to her insurance and Dr. Bhatia adjusted treatment to a less costly prescription (Ex. 10F/56-57). However, his exam findings were basically normal (Ex. 10F/56). In April 2017, the claimant complained of pain in both legs and feet but she admitted to 80% pain relief with treatment without side effects (Ex. 10F/50-52). In July 2017, Dr. Bhatia noted the claimant's pain was under control with medication (at "4" to "5" on a 10-point scale and she denied any new problems (Ex. 10F/47). She admitted to good pain relief (Ex. 10F/48). When the claimant returned to Dr. Bhatia in January 2018, she had last seen him in July 2017, and she had run out of medications (Ex. 10F/38, 45). It is noteworthy that she admitted she had been doing well on her medications (Ex. 10F/38). In March 2019, the claimant had no new neurological complaints (Ex. 10F/5). She admitted to 75% pain relief with her medications, better functioning, and no side effects (Ex. 10F/13-14). She was considered stable (Ex. 10F/5). In May 2019, the claimant admitted to 75% relief of pain but she complained her Fentanyl was taken away (Ex. 10F/3). She denied side

effects (Ex. 10F/4). Dr. Bhatia noted a pharmacy concern about her multiple pain relief prescriptions (Ex. 10F/1). He also noted she was positive for Benzodiazepine but not for her pain relief medications (Ex. 10F/2). Other than decreased sensation to pinprick in her feet, Dr. Bhatia documented normal exam findings in 2019 (Ex. 10F/1-2).

AR 22-23

Exhibit 4F contained Dr. Bhatia's treatment records from May 2015 to November 2016, which would have the most relevance as to Plaintiff's RFC during the relevant period (between her alleged onset date of August 7, 2015 through her date last insured of December 31, 2016).

The ALJ first cited notes indicated Plaintiff had good days and bad days but was doing okay as of September 4, 2015.  But those are vague terms with little evidentiary value.  The ALJ noted "he <u>confirmed conservative treatment</u> involving oxycontin" (emphasis added).  However, Dr. Bhatia only confirmed the OxyContin treatment.  Importantly, it was not Dr. Bhatia but the ALJ who characterized that treatment as conservative.  The ALJ explained that Dr. Bhatia noted no surgery or aggressive interventions.  Importantly, there is no suggestion here that multifocal peripheral neuropathy of unknown etiology is treatable with surgery or aggressive interventions.  Further, the next page notes a trial of IVIG (intravenous immunoglobulin), which at a minimum is a treatment besides medication.

The ALJ then stated that "Dr. Bhatia noted the EMG testing, *her complaints of* progression with weakness in the dorsiflexors of the foot, particularly the peroneal nerves, and he confirmed decreased reflexes (Ex. 4F/7)." (emphasis added).  However, the weakness in the dorsiflexors and peroneal nerves were not based solely on subjective complaints.  Dr. Bhatia stated these abnormalities matter-of-factly suggested they were objectively verified, even though Dr. Bhatia did not set forth the results of manual muscle strength grading in traditional format.  Further, the alleged weakness appears correlated to the EMG/NCV findings at least to some extent, namely low amplitude of the bilateral <u>peroneal nerves</u> with polyphasic MUPs of the tibialis anterior and EDB

9

(which are <u>dorsiflexors</u> of the ankle and toe joints, respectively).  There is no support for the ALJ's suggestion that Dr. Bhatia's statements concerning dorsiflexor weakness was based solely or largely on subjective complaints.

Next, the ALJ appropriately noted examinations dated February 9, 2016, May 10, 2016, and November 2016, which generally showed normal muscle tone, no atrophy, no fasciculations, normal cranial nerves, normal gait, normal finger-to-nose and knee-to-heel tests, despite decreased sensation in the feet.  Ex. 4F/8–9 (AR 378–79, 382).  The ALJ described examinations after the relevant period which similarly noted normal strength, normal gait, normal reflexes and normal sensation but for some instances of reduced sensation to pin prick in the feet.  AR 382.

The ALJ referenced that he "simply continued her medications with a prescription for Oxycodone 30 milligrams twice a day as needed for breakthrough pain (Ex. 4F/9)."  AR 379.  That statement is not fully correct as Dr. Bhatia increased levorphanol from 3 times daily to 6 times daily while continuing her on other medications.  *Id.*

The ALJ noted that various check-box pain questionnaires (the Pain Assessment and Documentation Tool, or "PADT") cited significant percentages (50 to 80%) of pain reduction with improved functioning. AR 402–05.  In contrast however, the PADT forms generally noted an average pain level of 7 to 8 out of 10, which is inconsistent with a 50 to 80% pain reduction.  *Id.*

Similarly, the ALJ cited numerous PADTs post-dating the relevant period but focused only on the percentage pain reduction identified at question three, while disregarding PADTs that reflected less percentage pain reduction or no such reduction, and disregarding the average numerical pain rating from question one which was invariably quite high.  *See, e.g.*, AR 471 (May 2, 2019 PADT noting level 6/10 to 7/10 average pain levels but also 75% pain reduction); AR 488 (July 29, 2018 PADT noting 7/10 to 8/10 average pain level with 20-25% pain reduction); AR 496 (June 19, 2018 PADT noting 7/10 to 8/10 average pain level with 20-25% pain reduction and worse

functioning in all ADLs); AR 513 (January 24, 2018 PADT noting 9/10 to 10/10 average pain level with no percentage relief specified).

In sum, the ALJ appears to have made some factual errors and drew erroneous inferences. Specifically, 1- it appears he imputed to Dr. Bhatia statements he did not make (conservative opioid treatment); 2-minimized statements Dr. Bhatia did make as merely recitation of subjective complaints ("weakness in the dorsiflexors of the foot, particularly the peroneal nerves,"); 3- minimized the importance of the gait abnormalities noted in the records accompanying Dr. Bhatia's opinion; and 4- selectively cited the PADT pain questionnaires.

Finally, it is worth noting that this being a pre March 27, 2017 claim, the treating physician rule applies along with the heightened standard of articulation ("specific and legitimate reasons") imposed upon ALJs when rejecting a treating physician opinion, a standard which was not met here.

The errors and omissions here are sufficiently numerous that it is difficult to narrow the scope of the task on remand. Simply put, on remand it is appropriate for the ALJ to reconsider all of the evidence discussed herein along with Dr. Bhatia's opinion.

### B.     Non-Severe Mental Impairments

#### 1.     Applicable Law

At step two the ALJ must determine if the claimant has a medically severe impairment or combination thereof. "An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a) & 416.921(a). Basic work activities are "the abilities and aptitudes necessary to do most jobs," and those abilities and aptitudes include: (1) physical functions such as walking, standing, sitting, lifting, and carrying; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5)

responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b) & 416.921(b).

Despite the meaning of the word "severe" in common parlance, the step-two severity threshold is not high. "An impairment or combination of impairments can be found not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual[']s ability to work." *Smolen*, 80 F.3d at 1290. "Step two, then, is a de minimis screening device [used] to dispose of groundless claims[.]" *Smolen*, 80 F.3d at 1290.

### 2.  **Analysis**

Plaintiff disputes the ALJ's finding that her major depressive disorder (MDD) and anxiety disorder were non-severe. Relatedly, Plaintiff disputes the ALJ's rejection of Drs. Portnoff and Michiel's consultative examining opinions to the contrary. Though Plaintiff's argument jumps directly to the ALJ's discussion of those opinions in the RFC analysis prior to step four, the ALJ's pertinent, but ultimately unavailing discussion, begins at step two.

### a.  **Step Two Analysis**

At step two the ALJ performed the "psychiatric review technique" (or PRT) which involves consideration of the four broad areas of mental functioning set out in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four areas of mental functioning are known as the "paragraph B" criteria. The ALJ found no more than mild limitations in each area and thus concluded that Plaintiff's MDD and anxiety disorder were non-severe.

As to the first area (understanding, remembering, or applying information), the ALJ explained:

> In this area, the claimant had no limitation. She was able to file her claim. She was able to understand, remember, and apply information sufficiently to have her representative file required forms such as her disability report (Ex. 2E). During the relevant period, Perminder Bhatia, M.D., consistently observed the claimant was in no acute distress, her mood, speech, and thoughts were normal, and her higher mental functions were normal (Ex. 4F/8, 10). He noted normal understanding,

> repetition and recall (Ex. 4F/10). Other providers have found her alert and in no acute distress, which while after the relevant period, they tend to show that the claimant has not had the degree of limitations in this area that she alleged (Ex. 11F/2). Similarly, a consultative examiner with mental health expertise found she retained immediate recall, and recent recall and to remember autobiographical information and her fund of knowledge was normal (Ex. 6F/5). Notably, the claimant's daughter did not assert any problems with understanding or remembering (Ex. 3E). The overall evidence demonstrates no limitation to understanding, remembering, or applying information during the relevant period.

AR 18–19.

As an initial observation, it is somewhat unpersuasive to suggest that one's completion of the application for disability benefits can itself serve as evidence that a claimant's impairments are not disabling. That would suggest that disability benefits are illusory.

The ALJ noted the treatment records from Dr. Bhatia (a neurologist) that Plaintiff was awake and oriented with no acute distress, had normal mood/speech/thought content with normal higher level functions and normal understanding, repetition, and recall. The ALJ also cited similar mental status findings from a PCP visit the purpose of which was to discuss an OB/GYN referral. However, these mental status findings were documented by non-mental health professionals at visits for unrelated purposes, eg., neuropathy and an OB/GYN referral. These findings were not as detailed or relevant as the findings of the two consultative psychologists, Drs. Portnoff and Michiel, to whom Plaintiff was referred for the specific purpose of evaluating her mental fitness to work.[3]

As to the lack of any mention of understanding/memory limitations in Plaintiff's daughter's third party function report, although it is true that her daughter did not check the corresponding boxes from the list of potential problems, when asked to respond in narrative format as to how well Plaintiff follows written or spoken instructions, the daughter indicated Plaintiff tends to get confused by written instructions and asks for spoken instructions to be repeated over and over. AR

---

[3] The ALJ did emphasize the consultative examiner's findings as to normal immediate recall and fund of knowledge, but as explained below, the ALJ ultimately rejected the associated opinion.

251.

As to the other three areas of mental functioning, the ALJ identified routine but normal mental status findings noted by non-psychiatric specialists at visits for neuropathic pain management and OB/GYN concerns, along with the lack of related problems contained in the daughter's third party function report.

As to social interaction, the ALJ noted Plaintiff "lived independently in the community," that the claimant was able to interact with a field office employee with no problems during the teleclaim process, and was able to contact and hire a representative. The notes from the initial claims process do ask the field office personnel to make observations about their communication with the claimant. However, a claimant's successful completion of tasks inherent in the disability claims process does little to advance the suggestion that Plaintiff is not disabled.

Additionally, the ALJ noted a visit with <u>Dr. Cordoba (a GP)</u> on April 12, 2018, at which Plaintiff complained of depression, but her PHQ-9 depression screening questionnaire reflected a score of zero. Importantly, this visit postdated the relevant period by fifteen months—of more relevance would be the consultative psychiatric examination that occurred with Dr. Portnoff on March 11, 2017, which was only about two months after the relevant period concluded.

### b. **Rejection of Drs. Portnoff and Michiel's Opinions**

At the RFC stage the ALJ revisited the mental health impairments. The ALJ noted that Dr. Portnoff conducted a consultative psychiatric evaluation on March 11, 2017, diagnosing depressive disorder with anxious features and opining as follows:

> He then opined she was capable of simple repetitive tasks and had mild limitation in the ability to perform detailed complex tasks; mild to moderate limitation to interacting with others; no limitation to working on a consistent basis without special or additional instruction due to psychiatric problems; no limitation to regular attendance In the workplace from a psychological standpoint; mild to moderate limitation in her ability to complete a normal workday or workweek; and mild to moderate impairment to dealing with stress in a competitive work environment (Ex. 6F).

The ALJ addressed the opinion as follows:

> The undersigned agrees with him that the claimant had no limitation to working on a consistent basis without special or additional instruction and had no limitation to regular attendance in the workplace from a psychological standpoint. However, there is little support for his conclusion that the claimant had moderate mental limitations in several other areas or was limited to simple repetitive tasks as he opined. In fact, other than a documented diagnosis of depression, there is little documentation in the treatment notes of any mental limitations during the relevant period; for example, treating providers found her alert and oriented and exhibiting normal mood, affect, behavior and thought content (Exs. 1F-4F; 9F/21-30). Dr. Portnoff's opinion that she was capable of managing her own funds independently tends to undermine his opinion of up to moderate l imitations. Furthermore, his opinion is simply inconsistent with the overall evidence of no limitation in most areas of mental functioning and no more than mild limitation in concentration, persistence, or maintaining pace. The undersigned gives his opinion little weight.

Here, the ALJ failed to acknowledge any of the deficiencies Dr. Portnoff noted upon examination, including: mild psychomotor slowing/discomfort; mild to moderately reduced facial kinetics; quiet, flat speech lacking in spontaneity; coherent but mildly rambling thought process; mild to moderately flattened affect; delayed recall 2/5; inability to interpret a common proverb; and, inadequate social judgment. Given that the ALJ disregarded what appears to be significant probative evidence, it does not seem appropriate to speculate as to whether the normal findings noted by Dr. Portnoff and other providers was sufficiently substantial evidence to support the non-severity finding and the mental RFC.

Further, with respect to Dr. Michiel's November 2018 opinion that Plaintiff was unable to carry out even simple job instructions (AR 425), the ALJ rejected it in part because it post-dated the relevant period by nearly two years. Plaintiff responds that it was nevertheless useful because it suggests her condition worsened after the relevant period. However, whether Plaintiff's functioning worsened thereafter is not significantly relevant to her disability status during the relevant period.

The ALJ also noted that Plaintiff received no specialized mental health treatment. AR 19.

Not seeking specialized treatment from a mental health professional, or obtaining an assessment from a mental health professional, is certainly a relevant consideration. However, the agency did refer her for a consultative psychiatric examination with Dr. Portnoff, ostensibly to fill in that evidentiary gap. Thus, the lack of specialized treatment in this situation does not offer an especially strong basis upon which to reject Dr. Portnoff's opinion.

The Court therefore find that Remand is appropriate for the ALJ to properly consider the entirety of Dr. Portnoff's opinion, the numerous mental deficiencies identified in Dr. Portnoff's examination findings, and to reconcile those findings with the ALJ's conclusion about Plaintiff's mental impairments.

### 3. Plaintiff's Subjective Complaints

Plaintiff emphasizes the following hearing testimony and subjective statements made to providers (chiefly, Dr. Bhatia) as to the severity of her pain: 1-prior to her DLI she had to be off her feet or elevate her legs for at least four out of five hours and she was unable to lift more than a gallon of milk and that was a struggle (AR 54–55); 2-she was in a constant state of pain and the pain was burning in her feet and ankles up to just below her knees and in her hands, wrists and forearms (AR 52–53, 257); 3-her pain waxed and waned, she had good days and bad days but her pain never went away (AR 382, 402, 404–05 496, 516); 4-during the relevant period her average reported pain levels ranged from 7/10 to 8/10 with her worst pain levels ranging from 8/10 to 9/10.

These statements to a large extent were already addressed above in the discussion of Dr. Bhatia's treatment notes and PADTs. The ALJ asserted the same objective bases for rejecting Dr. Bhatia's opinion here as the ALJ did for rejecting Plaintiff's related testimony.

In regard to additional reasoning the ALJ gave for rejecting Plaintiff's testimony, and/or subjective pain levels as reported to her providers, is the following:

> The undersigned also considered other factors that further illustrate the inconsistency of the allegations with the evidence. First, for example, her activities

of daily living are not as limited as would be expected in light of her allegations. Second, the claimant's income records document other periods with little to no earnings, which leads to a reasonable conclusion that she may have had other reasons for not working at various times in her life, such as caring for family members or other similar responsibilities (Ex. 4D-14D). During the hearing, the claimant admitted she was laid off in 2015, a term indicating a job loss related to an economic downturn rather than an individual's performance or health status. She also testified she had another period with no income when she was caring for an ill relative. Third, she has not challenged herself by attempting to return to work or attempting other work. She admitted she did not look for other work after the layoff, asserting she received continuing benefit payments through the employer for a few months, but did not have to seek other work for those benefits. The claimant's prior work record is not a determinative factor; however, the fact that she was laid off and did not attempt to return to work, does not support the claimant's allegations that except for her impairments she would be working (20 C.F.R 404.1529(c)(3)
AR 24..

As to the ADLs, the ALJ provided no citation, description, or example, and the discussion that followed was not significantly persuasive.  Although the regulations do permit the Commissioner to consider a claimant's prior work record in evaluating symptom testimony (20 C.F.R 404.1529(c)(3)), the ALJ took the discussion perhaps a step beyond the parameters outlined in 20 C.F.R 404.1529(c)(3) by suggesting Plaintiff's allegations would have been more credible had she attempted to return to work after she was laid off in 2015.  Credibility aside, Plaintiff claimed a disability onset date as of August 2015, and a claimant may not engage in substantial gainful activity after the alleged onset date of disability because to do so is disqualifying at step one.  20 C.F.R. 404.1571.  Even an unsuccessful work attempt (depending on the duration) can be disqualifying at step one.  Further, per the regulations "even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did." 20 C.F.R. 404.1571.

Thus, the ALJ's commentary runs contrary to the admonitions in 20 C.F.R. 404.1571 about the potential adverse consequences of engaging in any work activity following the alleged disability onset date.

### C. Remedy

#### 1. Applicable Law

When a court does not affirm the agency's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Treichler*, 775 F.3d at 1099. A court may remand for an immediate award of benefits if: 1- the ALJ failed to provide legally sufficient reasons for rejecting evidence; 2- there are no outstanding issues that must be resolved before a determination of disability can be made; and, 3- it is clear from the record that the ALJ would be required to find claimant disabled is such evidence is credited. *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004).

#### 2. Analysis

Plaintiff argues that remand for payment of benefits is warranted because if Dr. Portnoff's mental RFC opinion is properly credited limiting her to simple and routine tasks, and that she would not be able to perform her past work as an HR generalist which requires a reasoning level of R5. Plaintiff further contends that, if she could not perform her past work as an HR generalist, had the analysis proceeded to step five then rule 202.02 of the medical vocational guidelines (the grids) would mandate a disability finding for someone in her age category limited to light work who has no transferable skills. MSJ at 22 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 2, Rule 202.02). However, it is not abundantly clear that Plaintiff's step five vocational and skill transferability analysis is correct based on the hypotheticals posed to the VE at the hearing. Further, if the analysis was as grounded in certainty as Plaintiff contends, Plaintiff would presumably be able to point to case authority where a court performed the step five analysis in the first instance on appeal, including vocational profile, skill transferability, grid rule application, and then directed an award of benefits based on the court's independent step five analysis rather than remanding for further proceedings. Plaintiff identifies no such authority.

### VI. Remand For Further Proceedings

Remand is therefore warranted for the ALJ to: 1- reconsider Dr. Bhatia's opinion as to Plaintiff's physical limitations; 2- reconsider Dr. Portnoff's opinion as to Plaintiff's mental limitations; 3- reconsider all associated evidence; 4- to develop the record as necessary; and, 5- conduct a new hearing and issue a new decision.

### VII. Order

For the reasons stated above, substantial evidence and applicable law do not support the ALJ's conclusion that Plaintiff was not disabled. Accordingly, it is ordered that the Commissioner's decision is reversed and this matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. The Clerk of Court is directed to enter judgment in favor of Plaintiff Theresa Lydia Stremple and against Defendant Commissioner of Social Security.

IT IS SO ORDERED.

Dated:  **April 14, 2024**                    **/s/ Gary S. Austin**
                                                              UNITED STATES MAGISTRATE JUDGE